UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAREFREE PARK CORPORATION, AMIN NABHAN and JAMILE NABHAN, <br><br>               Plaintiffs, <br><br>         v. <br><br> ADIB NABHAN, <br><br>             Defendant. | Civil Action No.  2003-CV-12426 RCL |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE CONCERNING CLAIMS OF BREACH OF DUTY AND CONVERSION

Plaintiffs Carefree Park Corporation ("Carefree Park"), Amin Nabhan ("Amin") and Jamile Nabhan ("Jamile") (collectively, "Plaintiffs") hereby oppose the motion in limine of defendant Adib Nabhan ("Defendant" or "Adib") to exclude evidence of Adib's breaches of fiduciary duty and conversion in connection with his establishment of a business, Fun Depot, Inc., in Florida.

### INTRODUCTION

Though denominated as a motion in limine, Defendant's motion is more accurately characterized as a belated motion for summary judgment. Defendant's argument that Plaintiffs' claims are barred by the statute of limitations is based on the faulty premise that Plaintiffs were allegedly on constructive notice as early as 1997 that Adib intended to take over the Nabhan family's operations in Florida and exclude Plaintiffs entirely from what had previously been their joint ownership of the business.

As detailed below, Defendant's motion is dependent on the Court ignoring entirely the facts that are fatal to his motion. For example, Adib conveniently ignores the evidence adduced during discovery that he affirmatively concealed his wrongdoing from Plaintiffs and that it was not until late in 2001 that Adib finally revealed to Plaintiffs that he alone owned Fun Depot, to the exclusion of Plaintiffs and other members of the Nabhan family.

In addition, Defendant's motion misapprehends settled law in Massachusetts regarding the commencement of the running of the statute of limitations in cases among fiduciaries. In short, constructive knowledge does not suffice to start the running of the statute of limitations when a corporate director decides to seize for himself an opportunity and assets belonging to his corporation. *Lattuca v. Robsham*, 442 Mass. 205, 213 (2004). Rather, the statute of limitations on such claims in Massachusetts does not begin to run until a director and shareholder such as Adib explicitly repudiates his fiduciary obligations *and* the person to whom the duty is owed has actual knowledge of the repudiation. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 518 (1997) (emphasis in original). Because there is substantial evidence showing that Adib did not publicly repudiate his duties and that the Plaintiffs were never aware (nor could they be) of any such repudiation, the motion in limine should be denied.

## BACKGROUND

Carefree Park was formed in 1971. Initially, the shares of Carefree Park were owned one-quarter each by the four Nabhan brothers, Amin, Adib, Louis and George. Since the late 1980s, Carefree Park has been owned one-third each by Amin, Adib and their sister, Jamile.

Carefree Park owns real estate in Massachusetts and Florida and operates an arcade business in Salisbury, Massachusetts. In the late 1970s, Amin and his siblings recognized that Salisbury Beach was in decline. Accordingly, the family determined to expand operations. Starting in 1978, the family commenced operating an amusement park business in New London,

Connecticut. A new corporation, Nabhan Enterprises, was formed, and Adib was tapped to move to Connecticut to head up the operations there. Nabhan Enterprises was owned by the four Nabhan brothers, but Adib sent the money generated in Connecticut to Carefree Park. As Adib acknowledged in his deposition, the Connecticut business "was run to benefit, to support the family, yes." (Adib depo. at p. 20.)[1]

In 1984, Carefree Park acquired a parcel of real estate in Lake Worth, Florida. The plan was for Carefree Park to open an arcade business in Lake Worth for the benefit of the Nabhan family. In approximately 1988, Adib moved to Florida to run Carefree Park's arcade business in Florida. The New London, Connecticut business was closed and the equipment was sold at auction. In order to outfit the new business in Florida, which always operated under the name Fun Depot, Carefree Park shipped existing equipment from Salisbury to Florida and bought new equipment for the Florida operations. Carefree Park continued to buy new equipment for the Florida operations for many years.

In 1995, Adib and Amin agreed that it would be prudent to form a separate corporation -- separate from Carefree Park -- for purposes of operating the Florida arcade business, in order to insulate Carefree Park (and Carefree Park's substantial real estate holdings) from any potential tort claims that could arise out of the operation of the amusement business.[2] In February 1996, Adib formed Fun Depot. Amin and Jamile reasonably believed, based on the family's long history of running everything for the benefit of the family as a whole and their status as shareholders of Carefree Park, that they would have an ownership interest in the new business. Unbeknownst to Amin and Jamile, Adib made himself the sole shareholder with the intention eventually of excluding Amin and Jamile from the business. According to Adib, from that point

---

[1]     Pertinent pages from the deposition of Adib are attached hereto as Exhibit A.

[2]     Indeed, Carefree Park had recently been sued by an individual who had been hurt while on a go-cart ride at the Florida arcade.

forward, Fun Depot was supposed to "pay the bills that were incurred in connection with the operation of that business," and "own any profits realized in the operation of the Lake Worth arcade business." (Adib depo. at p. 38.) In fact, however, for several years after the formation of Fun Depot, Fun Depot continued to use the equipment that Carefree Park had sent from Massachusetts without payment to Carefree Park. (Adib depo. at pp. 41-42, 132-133.) Carefree Park continued to buy arcade games (worth $250,000 in 1998 and $170,000 in 1998) for the Florida operations. Those purchases were made by Adib with Carefree Park's money. (Adib depo. at pp. 59-61, 78-79, 100.) Carefree Park continued to realize operating income from the Florida operations and Carefree Park, with Amin and Jamile as individual guarantors, borrowed $1.8 million in mid-1996, months after the formation of Fun Depot, to fund capital improvements which, according to Adib, were for the benefit of Fun Depot. (Adib depo. at pp. 82-83.) Moreover, Adib continued to deposit some but not all of Fun Depot's operating income into Carefree Park's bank account.[3] (Adib depo. at pp. 63-64.)

Between 1998 and 2002, Adib related to his siblings that he was struggling to make a living in Florida and that there was not much extra money to go around. He paid a nominal rent to Carefree Park every year, despite not having a lease. The rent varied from year to year and basically represented the amount needed to make up any shortfall in the carrying costs on the property after rents were received from the other tenants. (Adib depo. at pp. 119-120.) In addition, Adib sent modest amounts of money to Amin each year for the benefit of the family. Amin understood that this was their share of the income from the Florida business. According to Adib, however, these payments were nothing more than gifts that he made "out of the goodness of [his] heart." (Adib depo. at p. 45.)

---

[3]    At the time, Amin and Jamile believed that Adib was taking a reasonable salary for himself but otherwise thought that the Florida operations were basically breaking even.

Throughout the period from 1996 to the present, Adib has continued to own one-third of Carefree Park and to maintain his ownership interest in various family real estate trusts in Massachusetts. (Adib depo. at pp. 72-73.) Until he was removed in 2003, he continued to be a director of Carefree Park.

By late 2001, Amin was concerned that Adib was making a lot more money than he was letting on to the family. Accordingly, Amin confronted Adib in late 2001. It was then that Adib finally disclosed that he alone owned Fun Depot and that his siblings owned nothing. (*See* Amin depo. at pp. 191-192.)[4] (*See also* Jamile depo. at p.27.) This litigation was commenced in a timely manner in October 2003.

## ARGUMENT

To prevail on his motion, Adib must show that, prior to October 2000, he affirmatively repudiated his fiduciary duties to his siblings by informing them (i) that he owned 100% of the new corporation (Fun Depot) and that Amin and Jamile had no interest in Fun Depot, (ii) that he had taken sole ownership of all of Carefree Park's equipment and other capital assets in Florida, free of charge, (iii) that he would continue to use Carefree Park's funds to purchase new equipment, for his own exclusive benefit, (iv) that he would continue to use Carefree Park's good credit to borrow money for the sole benefit of Fun Depot, and make Amin and Jamile personally liable as guarantors for the indebtedness, and (v) that he would pay only nominal rent to Carefree Park, basically in an amount sufficient to enable Carefree Park to make up any shortfall it experienced in covering its carrying costs for the property, after accounting for the rents paid by other tenants on the site. Moreover, according to Adib's theory, he would get to do all these things to the obvious disadvantage of the Plaintiffs without giving up his interest in the family's Massachusetts holdings.

---

[4]    Pertinent pages from the depositions of Amin and Jamile are attached hereto as Exhibits B and C, respectively.

Adib's contention that his siblings and Carefree Park agreed to give up their ownership interest in Florida and get nothing in return is absurd on its face, is flatly contradicted by the testimony of Amin and Jamile, and is totally inconsistent with the facts that demonstrate that Amin and Jamile continued to fund and support Fun Depot's operation in Florida long after Adib claims to have become the sole owner. Adib has not adduced a single piece of evidence that would show any clear and explicit acquiescence by Amin and Jamile in Adib's misappropriation of the Fun Depot operation for himself. Nor has he provided any explanation of why Plaintiffs would agree to such a patently unfair and one-sided arrangement. More importantly, Adib has not offered any evidence that he told Amin and Jamile about the ownership structure of Fun Depot before 2001.[5] Instead he claims in his present motion that Amin and Jamile were on constructive notice of his breaches of fiduciary duty by virtue of conversations that he claims took place between Adib's accountant in Florida and Carefree Park's accountant in New Hampshire.[6] Those alleged contacts do not come close, however, to serving as the sort of notice necessary to start the statute of limitations running on a claim of breach of fiduciary duty involving the misappropriation of assets and corporate opportunity by a fiduciary of a corporation.

The law in Massachusetts imposes an onerous burden on fiduciaries seeking to avail themselves of the statute of limitation. "Breach of fiduciary duty is a cause of action in tort that is governed by G.L. c. 260, § 2A, which provides for a three-year period of limitation." *Lattuca*

---

[5]   If properly considered as a motion for summary judgment, the myriad material facts in dispute would dictate the prompt denial of Adib's motion.

[6]   To compound the problem, the witness that Adib relies upon, his Florida accountant Craig Peterson, was not identified by Adib in his initial disclosures under Rule 26. Nor was Craig Peterson ever identified as a material witness during discovery. Rather, he was sprung on Plaintiffs at the eleventh hour. For this reason alone, the Court should deny Adib's motion.

*v. Robsham*, 442 Mass. 205, 213 (2004). The running of the statute is governed by the repudiation of trust doctrine, which "applies to the conduct of corporate officers and directors who stand in a fiduciary relationship toward the corporation." *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 518 (1997). The Massachusetts Supreme Judicial Court has consistently held that, pursuant to the repudiation of trust doctrine, "a cause of action does not accrue until the trustee repudiates the trust *and* the beneficiary has actual knowledge of that repudiation." *Id.* (emphasis in original) "[A] cause of action for breach of fiduciary duty does not accrue until the beneficiary has actual knowledge of the fiduciary's breach. <u>Constructive knowledge is insufficient</u>." *Lattuca*, 442 Mass. at 213 (emphasis added).

"When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G.L. c. 260, §12, for the period prior to the plaintiff's discovery of the cause of action. Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12. *Demoulas*, 424 Mass. at 519. "Because an actual knowledge standard applies" in such cases, "we reject . . . the argument that the plaintiff should be held to a reasonable diligence standard so as to invoke the so-called discovery rule, applicable in most cases, that a cause of action accrues for purposes of the statute of limitations on the happening of an event likely to put the plaintiff on notice of facts giving rise to the cause of action . . . The objective standard of reasonableness developed in these cases does not displace the actual knowledge standard that has been applied to violations of fiduciary duty that constitute fraudulent concealment under G.L. c. 260, § 12, or conduct involving a repudiation of trust." *Id.*, 424 Mass. at 520-521.

Consistent with the repudiation of trust doctrine, the Massachusetts Supreme Judicial Court has held that a cause of action for breach of fiduciary duty does not accrue until the

repudiation "has come home" to the beneficiary. *Akin v. Warner*, 318 Mass. 669, 676 (1945).
*See Houle v. Low*, 407 Mass. 810, 812 (1990) (plaintiff's cause of action for misappropriation of
corporate opportunities did not accrue until he was informed of decision not to invite him to
participate in new medical practice).

      In this case, Adib does not even claim to have given any actual notice to his siblings of
his intention to keep Fun Depot for himself.  Instead, his entire argument is based on the
contention that Amin and Jamile had constructive notice that they were not involved in Fun
Depot because of financial information given by Adib's accountant in Florida, Craig Peterson, to
Carefree Park's accountant in New Hampshire, Mike Leclerc.  He claims that the information
provided should have alerted Leclerc to the fact that Fun Depot was an S corporation and that,
therefore, Carefree Park, as a C corporation, could not possibly have been an owner of Fun
Depot.  He also claims that the fact that the two corporations did not consolidate their financial
statements should have signaled to Leclerc that there was no relationship between them.  Adib
does not allege that Peterson communicated directly to Amin or Jamile that they had no
ownership interest in Fun Depot, nor does he claim to have any knowledge that Leclerc did so.
He instead relies on principles of agency law and attempts to impute the knowledge supposedly
imparted to Leclerc as Carefree Park's agent to Carefree Park and Amin.  In other words, he
claims that the constructive knowledge that Leclerc should have gleaned from his conversations
with Peterson triggered an obligation on the part of Amin under the discovery rule to inquire
further into his status at Fun Depot.  As noted above, however, neither constructive knowledge
nor the discovery rule has any place in an action such as this, and Adib's reliance on constructive
knowledge once removed does not come close to satisfying the repudiation of trust doctrine.

      Even as evidence of constructive knowledge, Adib's factual allegations are woefully
inadequate.  The fact that Fun Depot was an S corporation may have prevented Carefree Park

from being an owner of Fun Depot, but it did not mean that Amin and Jamile, who are also plaintiffs here, could not be shareholders or did not have an interest in the Florida business. Moreover, the statement in the Carefree Park financial statements that "During 1996, one of Carefree Park's shareholders created a new corporation" does not state unambiguously that Amin and Jamile were not participants in the venture; there would be nothing out of the ordinary about one family member creating a new corporation in which other members are shareholders, nor would there be any need to reveal their participation to the public in the financial statements. That is particularly true here where the purpose of forming Fun Depot was to shield Carefree Park from potential tort exposure. (*See* Amin depo. at p.190.) The fact that Amin and Jamile did not receive regular distributions from Fun Depot also proves nothing. After all, Adib did occasionally send money to his family that he represented as being all he could afford and such payments were consistent with the family's long history of share and share alike, regardless of corporate formalities. If anything, these modest payments by Adib served only to lull Amin and Jamile into believing that Adib was continuing to protect their interests.

Finally, any knowledge that Amin and Jamile could supposedly have derived from the financial statements was more than offset by the course of conduct by which Adib used Carefree Park's resources and goodwill to get the Florida business off the ground, in a way that was totally inconsistent with his subsequent claim to be the only one entitled to share in its success. Here again, there was no reason for Amin and Carefree Park to suspect that Adib had misappropriated the assets and the corporate opportunity in Florida and no clear repudiation of trust sufficient to start the running of the statute of limitations.

## CONCLUSION

For the foregoing reasons, defendant Adib Nabhan's motion in limine to exclude evidence concerning his breaches of fiduciary duty and conversion should be denied.

CAREFREE PARK CORPORATION,
AMIN NABHAN and JAMILE NABHAN,

By their attorneys,

Robert L. Kirby, Jr. (BBO #550538)
Gordon M. Jones, III (BBO # 549016)
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110-2131
(617) 345-1000

Dated:  January 27, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail or electronically on January 27, 2006.

Robert L. Kirby, Jr.