UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CASE NO.: 03-CV-12426 RCL

CAREFREE PARK CORPORATION,

    Plaintiff,

vs.

ADIB NABHAN,

    Defendant.

_____/

DEPOSITION OF ADIB NABHAN

Tuesday, January 25, 2005

9:10 a.m. - 3:04 p.m.

201 N.E. First Avenue

Delray Beach, Florida  33444

Reported By:

Mary M. Karns, Certified Shorthand Reporter

Notary Public, State of Florida

Esquire Deposition Services

Boca Office       Job #701592

Phone - 800.357.6952

    561.338.0955

Exhibit A

Page 18

have amusement rights there.
Q. And when you say we have amusement rights, do you refer to Carefree Park?
A. Yes.
Q. And so Carefree Park set up operations in Connecticut?
A. Yes.
Q. And were you tapped to be the person to go down and head up those operations?
MR. VALLEY: Objection. You can answer.
THE WITNESS: Yes.
Q. (By Mr. Kirby) How did that come about?
A. Amin and I went to a convention. We met a gentleman that operate the park and he was looking for an amusement to be in their park, so we went down to New London, Amin and I, and we meet with the Beach Board and I saw the park and the park, I thought that was a pretty good deal, so I talked to Amin and he said well, who's going to do it? I told him I can handle it, so we moved there and I started operating there and we started a new corporation called Nabhan Enterprises and I operate amusement parks for ten years.
Q. So you operated the park in Connecticut from roughly 1978 to 1988?
A. Yes.

Page 19

Q. And who were the owners of Nabhan Enterprises when it was formed?
A. That was Amin, George, Louis and myself.
Q. Jamile held no interest in Nabhan Enterprises?
A. No.
Q. The operations in Connecticut that was --
Strike that.
What happened with the money that was made in the Connecticut operations? Who shared in it?
A. That was I shared with it and my brother shared with it.
Q. Your brother, Amin?
A. Yes.
Q. Anybody else?
A. I sent the money to Carefree Park, to the beach. I don't know who shared it with.
Q. Was it your understanding at the time that the Connecticut operations were being run for the benefit of the family much like the Salisbury operations?
A. Well, basically, we have the businesses set up each one will have his own. I operate Connecticut. Amin operate the big game room at the beach. Louis was operating the bar and George was

Page 20

operating the small arcade and each one have its own individual business to take care of and --
MR. VALLEY: Go ahead, finish. Finish your answer.
THE WITNESS: And if somebody needed help, we helped out.
Q. (By Mr. Kirby) My question for you is a little different. My question is this. Was it your understanding that the Connecticut business that you were in charge of operating was being run for the benefit of the entire family?
A. It was run to benefit, to support the family, yes.
Q. In other words, it wasn't being run for your benefit alone?
A. Right.
Q. Just like the Salisbury property was not being run by Amin for his benefit alone; right?
A. That's correct.
Q. And George was not running the bar for his exclusive benefit; right?
A. That's correct.
Q. And Louis wasn't running the small arcade for his exclusive benefit?
A. That's correct.

Page 21

Q. It was all for the collective benefit of the family?
MR. VALLEY: Objection. You can answer.
THE WITNESS: Actually, it was all for collected benefit for Amin because Amin want to stay in control of everything and Amin want to dominate everything we operate in. That was the way it was run.
Q. (By Mr. Kirby) So is it your testimony that Amin took all the money from all these operations?
A. Definitely.
Q. But isn't it the case, sir, that your brother, Amin, was the president of Carefree Park?
A. That's correct.
Q. And as president it was his responsibility to be in charge of day-to-day operations?
A. That's correct.
Q. What happened with the Connecticut business?
A. We liquidated.
Q. Why did you do that?
A. Because I had to come down to Florida to take care of the property here.
Q. Was the Connecticut business profitable or not profitable?

Page 38

MR. VALLEY: Just read it to yourself.
THE WITNESS: Okay.
MR. VALLEY: And then just read your answer to yourself right on down.
Q. (By Mr. Kirby) Before I ask you about this let me back up for a minute. I forgot to ask you a couple of questions. When you formed Fun Depot in 1996, was it your intention that from that date forward Fun Depot would operate the Florida arcade business?
A. Yes.
Q. And so Fun Depot would pay the bills that were incurred in connection with the operation of that business; is that right?
A. That's correct.
Q. And Fun Depot would realize any profits that might be generated in the operation of that business; is that right?
A. What's that?
Q. From the date of its formation in 1996 forward, is it your understanding that Fun Depot would own any profits realized in the operation of the Lake Worth arcade business?
A. That's correct.
Q. So from the date of the formation of Fun Depot forward, Carefree Park was simply the landlord

Page 39

down there?
A. Yes.
Q. It was otherwise divorced from the operations of the arcade business?
A. Yes.
Q. Whatever money was spent was supposed to be Fun Depot's money; is that right?
A. Yes.
Q. And whatever money was earned was supposed to be Fun Depot's money?
A. Right.
Q. Now, let's go back to interrogatory answer number one. Do you see in the second paragraph it says on the date --
MR. VALLEY: After, I'm sorry, Bob, after the objection paragraph?
MR. KIRBY: Yes.
MR. VALLEY: Okay.
Q. (By Mr. Kirby) It says on the date of its incorporation, Fun Depot consisted of a 4,000 square foot game room containing approximately 50 games, merchandise and supplies. Do you see that?
A. Yes.
Q. Who had paid for the construction of that 4,000 square foot game room?

Page 40

A. I did. Carefree Park did.
Q. It was Carefree Park; right?
A. And I did. I put my money in there, too.
Q. Approximately how much money was spent in constructing the 4,000 square foot game room, if you remember?
A. Construction, the game room or the whole building?
Q. The build out of the 4,000 square foot arcade?
A. You want to know number, how much?
Q. Approximately how much money had been spent to get that game room built out?
A. Basically we put carpet on the floor and we bought some counters to put in there and I wired all the electrical work in there.
MR. VALLEY: He just wants to know how much was spent to do that.
THE WITNESS: About $10,000.
Q. (By Mr. Kirby) And what was the source of that money?
A. My money.
Q. So it came out of your own bank account?
A. Yes.
Q. Did Carefree Park contribute any money to

Page 41

the build out of the 4,000 square foot arcade space?
A. I don't remember.
Q. It goes on to say that Fun Depot, when it was incorporated, contained approximately 50 games; is that right?
A. That's correct.
Q. And if you read a little further on down, it says the assets were acquired by Defendant. That's you; right?
A. Right.
Q. It says approximately ten of the games were obtained from Carefree Park and the remainder were obtained from either Brady Distributors or Birmingham Defendant by the Defendant; right?
MR. VALLEY: You misread that, but, Birmingham Vending.
Q. (By Mr. Kirby) Birmingham Vending, I'm sorry.
A. That's correct.
Q. Did Fun Depot pay for the ten games that were obtained from Carefree Park?
A. Indirect.
Q. What do you mean?
A. By services that Fun Depot provided Carefree Park.

**Page 42**

Q. You didn't write a check to Carefree Park for those ten games; right?
A. No.
Q. What services were provided to Carefree Park to pay for those ten games?
A. Fixing tenant space, finding tenants for Carefree Park.
Q. But wasn't that done by you in your capacity as a shareholder of Carefree Park?
A. Yes.
Q. Where did the money come from to buy the games that were purchased from Brady Distributors or Birmingham Vending?
A. Money I deposit in the bank from the operations and pay for it.
Q. What company paid for the games that were purchased from Brady or Birmingham?
A. Carefree Park.
Q. Now, can you explain to me, sir, why Carefree Park was buying machines to go into a business that was owned 100 percent by you and your wife?
    MR. VALLEY: Objection.
    THE WITNESS: Originally that business that we started, the game room, supposed to support me and my wife and we did the divorce in

**Page 43**

1996. For the same reason that he took all the benefit of the income from the beach, I get the 50 games from Salisbury Beach originally to start from.
    I was required to make the mortgage payments, pay the taxes, maintain the property, fix tenant improvement, yet on the other hand they have 300 games at the beach I had no help from, so I don't know what is Carefree Park. I'm trying to figure this out. Can you explain it to me?
Q. (By Mr. Kirby) My question is a little different, sir, and that is this. Isn't it the case that Carefree Park's money and bank account was used to buy some of these 50 games from Brady and Birmingham?
A. It was a check written from Carefree Park account, yes.
Q. Take a look at the next paragraph and it says that on the date of its incorporation, Fun Depot owned a go-cart track, 15 go-carts and associated equipment and inventory. Do you see that?
A. Yes.
Q. And it says those assets were purchased in December of 1992; is that right?
A. That's correct.

**Page 44**

Q. They were purchased in 1992 by Carefree Park; right?
A. They were purchased by money given from my dad put into Carefree Park.
Q. Carefree Park bought those assets; isn't that right, sir?
A. Technically, yes.
Q. So Carefree Park owned them from December 1992 until, if I understand your testimony correctly, February of 1996?
A. That's correct.
Q. And then Fun Depot become the owner?
A. That's correct.
Q. Did Fun Depot pay any money to Carefree Park to acquire these go-cart assets?
A. No.
Q. Fun Depot just took the assets for itself, right, starting in February of 1996?
A. That was an agreement I have with my brother to form a corporation and separate the assets.
Q. Well, when you say you separated the assets, you retained the same ownership interest in Carefree Park that you had had before the formation of Fun Depot; right?
A. That's correct.

**Page 45**

Q. The only separating that occurred was that Amin and Jamile were separated out of Fun Depot; isn't that right?
A. That's correct.
Q. And they didn't get anything for that; isn't that right?
A. They did.
Q. What'd they get?
A. I send them money every year.
Q. And why did you do that? Was that part of the agreement?
A. No. Because they were my brother and sister and I felt obligated to help them.
Q. So those payments that you made in later years, you did out of the goodness of your heart?
A. That's correct.
Q. Okay. Go to the next paragraph. You see there it says on the date of its incorporation, Fun Depot owned batting cages and associated equipment that had been purchased in 1994?
A. Right.
Q. Just like with respect to the go-carts, the batting cages had been acquired using Carefree Park's money; right?
A. No, Allied Specialty Insurance money. I

Page 38

MR. VALLEY: Just read it to yourself.
THE WITNESS: Okay.
MR. VALLEY: And then just read your answer to yourself right on down.
Q. (By Mr. Kirby) Before I ask you about this let me back up for a minute. I forgot to ask you a couple of questions. When you formed Fun Depot in 1996, was it your intention that from that date forward Fun Depot would operate the Florida arcade business?
A. Yes.
Q. And so Fun Depot would pay the bills that were incurred in connection with the operation of that business; is that right?
A. That's correct.
Q. And Fun Depot would realize any profits that might be generated in the operation of that business; is that right?
A. What's that?
Q. From the date of its formation in 1996 forward, is it your understanding that Fun Depot would own any profits realized in the operation of the Lake Worth arcade business?
A. That's correct.
Q. So from the date of the formation of Fun Depot forward, Carefree Park was simply the landlord

Page 39

down there?
A. Yes.
Q. It was otherwise divorced from the operations of the arcade business?
A. Yes.
Q. Whatever money was spent was supposed to be Fun Depot's money; is that right?
A. Yes.
Q. And whatever money was earned was supposed to be Fun Depot's money?
A. Right.
Q. Now, let's go back to interrogatory answer number one. Do you see in the second paragraph it says on the date --
MR. VALLEY: After, I'm sorry, Bob, after the objection paragraph?
MR. KIRBY: Yes.
MR. VALLEY: Okay.
Q. (By Mr. Kirby) It says on the date of its incorporation, Fun Depot consisted of a 4,000 square foot game room containing approximately 50 games, merchandise and supplies. Do you see that?
A. Yes.
Q. Who had paid for the construction of that 4,000 square foot game room?

Page 40

A. I did. Carefree Park did.
Q. It was Carefree Park; right?
A. And I did. I put my money in there, too.
Q. Approximately how much money was spent in constructing the 4,000 square foot game room, if you remember?
A. Construction, the game room or the whole building?
Q. The build out of the 4,000 square foot arcade?
A. You want to know number, how much?
Q. Approximately how much money had been spent to get that game room built out?
A. Basically we put carpet on the floor and we bought some counters to put in there and I wired all the electrical work in there.
MR. VALLEY: He just wants to know how much was spent to do that.
THE WITNESS: About $10,000.
Q. (By Mr. Kirby) And what was the source of that money?
A. My money.
Q. So it came out of your own bank account?
A. Yes.
Q. Did Carefree Park contribute any money to

Page 41

the build out of the 4,000 square foot arcade space?
A. I don't remember.
Q. It goes on to say that Fun Depot, when it was incorporated, contained approximately 50 games; is that right?
A. That's correct.
Q. And if you read a little further on down, it says the assets were acquired by Defendant. That's you; right?
A. Right.
Q. It says approximately ten of the games were obtained from Carefree Park and the remainder were obtained from either Brady Distributors or Birmingham Defendant by the Defendant; right?
MR. VALLEY: You misread that, but, Birmingham Vending.
Q. (By Mr. Kirby) Birmingham Vending, I'm sorry.
A. That's correct.
Q. Did Fun Depot pay for the ten games that were obtained from Carefree Park?
A. Indirect.
Q. What do you mean?
A. By services that Fun Depot provided Carefree Park.

Page 58

Now, we've already established that Fun Depot, Inc., was formed in February of 1996; is that right?
A. That's correct.
Q. Did you open a bank account for Fun Depot, Inc.?
A. Yes.
Q. When did you do that?
A. '96, I believe. I don't remember the exact date.
Q. It is true, though, sir, that even after Fun Depot, Inc., had its own bank accounts, the proceeds of the arcade operations continued to be deposited into Carefree Park's account; right?
A. That's how we pay the equipment, yes.
Q. And Carefree Park continued to pay most, if not all, of the bills related to the operation of the Florida business out of the Carefree Park Florida account, right, even after 1996? Do you want me to try it again?
A. Yes. Try it again. Explain to me what do you mean by most? I'll save you time.
Q. Did Fun Depot, Inc., pay for any of the expenses related to the Florida operations out of its bank account?

Page 59

A. Yes.
Q. What did Fun Depot pay for out of its bank account?
A. Paid all the employees, paid the light bill, paid for equipment.
Q. Not all the equipment; right?
A. Yes.
Q. Let me have this document bearing Bates numbers CPC2539, 2535, 2536, 2537 and 2538. I had to re-order the documents after they'd been Bates stamped because I realized they were not in the correct order.
   (Thereupon, the referred-to document was marked as Adib Nabhan Exhibit Number 6 for Identification by the court reporter.)
Q. (By Mr. Kirby) Mr. Nabhan, do you recognize Exhibit 6 as a check register for Carefree Park's Florida checking account at Republic Bank?
A. Yes.
Q. Now, sir, I went through this and noted a number of purchases of equipment from Brady Distributors. If you take a minute, starting with an entry on March 24th, 1997, do you see that there's a purchase from Brady for $50,000?
A. Yes.
Q. And on April 1st there's a purchase from

Page 60

Brady for $30,000?
   MR. VALLEY: Objection.
Q. (By Mr. Kirby) Is that right?
   MR. VALLEY: Did you say purchase?
Q. (By Mr. Kirby) Correct, purchase of equipment from Brady Distributors; right?
A. What was the date again?
Q. April 1st.
A. Yes.
Q. And on May 7th -- Strike that.
   On May 13th, Carefree Park purchased $15,000 worth of equipment from Brady Distributors?
A. Yes.
Q. And on June 13th, Carefree Park purchased $30,000 worth of equipment from Brady?
   MR. VALLEY: Objection.
   THE WITNESS: Yes.
Q. (By Mr. Kirby) And on June 17th, Carefree Park purchased another $20,000 in equipment from Brady?
   MR. VALLEY: Objection.
Q. (By Mr. Kirby) Right?
A. I'm sorry. What's the other date?
Q. June 17th.
A. Yes.
Q. And on July 1st, Carefree Park purchased

Page 61

$20,000 of equipment from Brady Distributors?
A. Yes.
Q. And these are all in 1997; right? That's what this check register covers?
A. Yes.
Q. And on August 24th, Carefree Park purchased $20,000 of equipment from Brady?
A. Yes.
Q. And on September 20th, Carefree Park purchased another $20,000 of equipment from Brady?
A. Yes.
Q. And on October 21st, another $20,000 from Brady; right?
A. Yes.
Q. And on November 26th, another $10,000 of equipment was purchased by Carefree from Brady; is that right?
A. I'm sorry. What was the other date?
Q. November 26th.
A. Yes.
Q. I added them all up. It comes to 235,000. I know you didn't do it. Does that sound about right, though?
A. Do you want me to go back and add them?
Q. It is what it is. Take a look at the

Page 62

entries for March 24th and March 28th. Do you see there are purchases from a company called Games International?
    MR. VALLEY: On the second page.
    THE WITNESS: Yes.
    Q. (By Mr. Kirby) Who's Games International?
    A. They supply slot machines and stuff like that.
    Q. So Carefree Park purchased $13,500 worth of equipment from Games International in March 1997?
    A. Yes.
    Q. Okay. It's also the case, sir, that throughout 1997, arcade income was being deposited into Carefree Park's account; right?
    A. That's correct.
    Q. And if you start on January 2nd, there's a deposit of arcade income in the amount of $9,350; is that right?
    A. Correct.
    Q. And all the way through, if you look on the last page, there was a deposit on December 31st, 1997 of arcade income in the amount of $4,503; is that right?
    A. That's correct.
    Q. So throughout 1997, even though you'd already formed Fun Depot, Carefree Park continued to be

Page 63

the bank account that was used to run that business?
    MR. VALLEY: Objection. You can answer.
    Q. (By Mr. Kirby) It's a terrible question. Let me try it again.
    The Carefree Park bank account was used throughout 1997 just as it had been used prior to the formation of Fun Depot, Inc.; isn't that right?
    MR. VALLEY: Objection. You can answer.
    Q. (By Mr. Kirby) That was a good question.
    MR. VALLEY: Just note my objection anyway.
    THE WITNESS: No.
    Q. (By Mr. Kirby) That's not correct?
    A. No.
    Q. Okay. What happened after the formation of Fun Depot that changed the way in which the Carefree Park account was used?
    A. Basically we deposit the money from the income of Fun Depo in Carefree Park and we pay the bills.
    Q. What money went into the Fun Depot, Inc., account?
    A. Money from the income.
    Q. So you would allocate and deposit some money in the Carefree Park account and some money in the

Page 64

Fun Depot account?
    A. Yes.
    Q. And how did you decide how much to put into each account?
    A. Whatever bills need to be paid, I paid through Carefree Park. I make sure I got it covered.
    Q. If you look at the check register, Exhibit 6, I think it is.
    A. Yes.
    Q. That also reflects rental income being deposited into the Carefree Park account; right?
    A. Yes.
    Q. It also reflects that the Carefree Park account was used to pay for certain construction expenses on the property; isn't that right?
    A. That's correct.
    Q. And the Carefree Park bank account was used in 1997 to pay the Republic Bank loan obligation; right?
    A. That's correct.
    Q. And what had the proceeds of that Republic Bank loan been used for?
    A. One more time.
    Q. What had the proceeds of the Republic Bank loan been used for?

Page 65

    A. To do the construction of the building.
    Q. And were you the person who had principal responsibility for making deposits into this Carefree Park account?
    A. Yes.
    Q. And you were the person with check writing authority that was writing these checks out of this Carefree Park account; right?
    A. Yes.
    Q. Take a look at the second page of Exhibit 6. Do you see on May 7th, 1997, check number 2755 was written to Carefree Park in the amount of $3,000?
    A. Yes.
    Q. What was that for?
    A. Sent it to Amin.
    Q. Why?
    A. I don't remember. I don't recall why.
    Q. Were you sharing some of the profits from the Florida operations with your family in Massachusetts?
    A. Yes.
    Q. And if you look on July 1st, 1997, it appears that you wrote a check to Carefree Park in the amount of $5,000; is that right?
    A. Yes.

17 (Pages 62 to 65)

Page 70

Identification by the court reporter.)
   Q. (By Mr. Kirby) Mr. Nabhan, I'm going to come back to these in some detail later, but first of all, could you just confirm for me that these are the Fun Depot, Inc., financial statements for the years 1996 through 2003?
   A. Yes.
   Q. Let me ask you to turn to the financial statement for Fun Depot for the year-ended December 31st, 1997, and in particular to Bates numbered page P&P99.
   A. Okay.
   Q. First of all, you see this is Fun Depot, Inc.'s, statement of revenue and expenses for the year 1997?
   A. Right.
   Q. And you see that Fun Depot, Inc., in its financial statement for that year, reports total sales of approximately $697,000?
   A. That's correct.
   Q. Now, was that $697,000 in sales generated in the arcade?
   A. Yes.
   Q. And is that $697,000 on top of the arcade revenue of approximately $318,000 that was reported for

Page 71

Carefree Park in Florida in Exhibit 7?
   A. Yes.
   Q. So the Florida arcade in the year 1997, had gross sales of approximately $1,015,000?
   A. That's correct.
   Q. And how did you decide to allocate 318,000 of those sales to Carefree Park and 697,000 of those sales to Fun Depot?
   A. You've got to understand that Fun Depot was solely for me to support my family originally from inception, the game room. And when we separated in 1996, the whole operation is supposed to be my operations, the same way the beach operation is supposed to be his operation. That was our understanding.
   MR. VALLEY: Just listen to his question and answer that question.
   Q. (By Mr. Kirby) The question is how is it that you decided to allocate $318,000 of 1997 arcade operations to Carefree Park and $697,000 of the 1997 arcade operations to Fun Depot, Inc.?
   MR. VALLEY: Objection. You can answer.
   THE WITNESS: Basically whatever I paid checks through Carefree Park I had to deposit money to cover it.
   Q. (By Mr. Kirby) Now, in your last answer

Page 72

you testified that -- Well, strike that. Let me ask the court reporter to read back the answer just before this last one you gave.
   (Thereupon, the referred-to answer was read back by the court reporter.)
   Q. (By Mr. Kirby) Mr. Nabhan, just a minute ago you testified that your understanding with your brother, Amin, was that the beach operation was supposed to be his operation. Was that your testimony?
   A. Yes.
   Q. And can you explain to me, sir, then --
Strike that.
   What do you mean by the beach operation?
   A. The arcades, the carrousel lounge, the game room, the apartments, the parking lots, he take care of the beach operation and I will take care of the Florida operations.
   Q. But didn't I understand your testimony to be that you still own a one-third interest in those beach operations?
   A. I still own one-third interest of the real estate, not the operations.
   Q. Who owns the operations?
   A. Carefree Park.
   Q. The company in which you own a one-third

Page 73

interest; right?
   A. But I don't get one-third benefits.
   Q. Go back, if you would, sir, please, to Exhibit 7. Do you have Exhibit 7 in front of you, sir?
   A. Yes.
   Q. That's the Carefree Park income statement for the Florida operations for 1997?
   A. Yes.
   Q. Do you see that on the expense side of the income statement it reflects purchases of $249,000 worth of equipment in 1997?
   A. Yes.
   Q. Why was Carefree Park buying equipment in 1997?
   A. Like I told you before, the account originally was opened on the Carefree Park account and I kept depositing money in it to pay expenses.
   Q. But it owned that equipment once it bought it; didn't it?
   A. If Carefree Park owned the equipment, Carefree Park owe me the money.
   Q. And what money is that, sir?
   A. The one I deposit into the account to pay for the equipment.
   Q. The money that came from the operations of

Page 78

```
 1   Q.   (By Mr. Kirby) All set?
 2   A.   I'm all set.
 3   Q.   Do you have Exhibit 9 in front of you,
 4  sir?
 5   A.   Yes.
 6   Q.   That's the check register for Carefree
 7  Park's Florida account with Republic Bank for the year
 8  1998; is that right?
 9   A.   Yes.
10   Q.   And this is the account that is also
11  referenced in Exhibit 6, right?
12   A.   Yes.
13   Q.   It's the same Republic account number.
14  It's just the next year, 1998 from 1997; right?
15   A.   That's correct.
16   Q.   In 1998, Carefree Park continued to buy
17  equipment from Brady Distributors for its Florida
18  operations; isn't that right?
19   A.   Yes.
20   Q.   You see, for example, on January 2nd,
21  1998, Carefree Park purchased $20,000 worth of equipment
22  from Brady Distributors?
23   A.   That's correct.
24   Q.   And on February 11th, 1998, Carefree Park
25  bought $20,000 worth of equipment; right?
```

Page 79

```
 1   A.   That's correct.
 2   Q.   And on March 2nd, Carefree Park bought
 3  another $20,000 worth of equipment from Brady?
 4   A.   That's correct.
 5   Q.   And on April 6th, Carefree Park bought
 6  another $25,000 worth of equipment from Brady?
 7   A.   That's correct.
 8   Q.   And on May 2nd, Carefree Park bought
 9  $20,000 worth of equipment from Brady?
10   A.   Right.
11   Q.   And on May 12th, Carefree Park bought
12  $15,000 worth of equipment from Brady?
13   A.   Right.
14   Q.   And on July 11th, Carefree Park bought
15  $20,000 worth of equipment from Brady Distributors?
16   A.   That's correct.
17   Q.   And on August 3rd, Carefree Park bought
18  $30,000 worth of equipment from Brady?
19       MR. VALLEY: That's the ones with the
20  check marks.
21       THE WITNESS: Yes.
22   Q.   (By Mr. Kirby) So in 1998, Carefree Park,
23  for its Florida operations, bought approximately
24  $170,000 worth of equipment from Brady?
25   A.   If your math is right.
```

Page 80

```
 1   Q.   And in 1998, you continued to deposit
 2  arcade income realized in the operation of the Florida
 3  arcade into Carefree Park's Florida account; is that
 4  right?
 5   A.   That's correct.
 6   Q.   Just as you had done in 1997?
 7   A.   That's correct.
 8   Q.   And in 1996?
 9   A.   That's correct.
10   Q.   And in 1995?
11   A.   That's correct.
12   Q.   And 1994?
13   A.   Yes.
14   Q.   And earlier?
15   A.   Yes.
16   Q.   And if you were -- Strike that.
17       Did you send copies of Carefree Park's
18  Florida check registers up to your family in
19  Massachusetts?
20   A.   Yes.
21   Q.   So they would see that you were continuing
22  to deposit income into the Carefree Park account; is
23  that right?
24   A.   That's correct.
25   Q.   And they would see that Carefree Park is
```

Page 81

```
 1  continuing to purchase equipment?
 2   A.   Correct.
 3   Q.   And things are continuing on as they had
 4  in the past?
 5   A.   Yes.
 6   Q.   Now, can you tell me, sir, it appears
 7  to me that the last operating income or arcade income
 8  deposit is made on November, excuse me, on September
 9  24th, 1998 for calendar year 1998. Do you see that?
10       MR. VALLEY: Just start from the back.
11       THE WITNESS: Right.
12   Q.   (By Mr. Kirby) Am I right about that?
13   A.   Let me find it first.
14       MR. VALLEY: What's the date again?
15       MR. KIRBY: September 24th, 1998.
16       THE WITNESS: Yes.
17   Q.   (By Mr. Kirby) Why is it that there were
18  no operating income or arcade income deposits into
19  Carefree Park's Florida account in 1998 after September
20  24th?
21   A.   Because we stopped.
22   Q.   Who's we? You stopped; right?
23   A.   I stopped, yes.
24   Q.   Okay. And why did you stop making such
25  deposits?
```

Page 82

A. Because I wanted to separate the company.
Q. Well, what happened in September of 1998 to cause you to want to separate the company, as you put it?
A. Because I needed to do my books properly.
Q. Well, didn't you testify earlier, sir, that one of the reasons you needed to fund Fun Depot in the first place was because you needed to separate Fun Depot's books from Carefree Park's books? Do you remember you said that earlier, sir?
A. I remember, but you've got to remember it's earlier. This operation was supposed to belong to me from originally and I separate in '96 and I continue to send my family money all along.
Q. Well, my question for you, sir, is you testified earlier that you needed, in order to continue to develop Fun Depot, you needed to separate Fun Depot from Carefree Park in 1996; right?
A. Yes.
Q. But, in fact, you continued to operate the arcade operation in Florida after the formation of Fun Depot, Inc., just the way you had before Fun Depot, Inc., ever existed; isn't that right?
MR. VALLEY: Objection.
THE WITNESS: Yes.

Page 83

Q. (By Mr. Kirby) And you were able to get additional bank financing in 1996 in the name of Carefree Park in order to finance significant improvements in the Florida property; isn't that right?
A. Carefree Park alone cannot borrow the money. I had to guarantee the money so I would be able to borrow it. My wife have to guarantee the money to be able to borrow it. Fun Depot have to guarantee the money to be able to borrow it.
Q. Your brother, Amin, had to guarantee the --
A. That's right. That --
Q. Let me finish, in order that the record is clear.
MR. VALLEY: Let him finish his question.
Q. (By Mr. Kirby) Isn't it true, sir, that your brother, Amin, was a guarantor of the Carefree Park loan that financed significant Florida improvements just like you were?
A. Yes.
Q. And your sister, Jamile, was a guarantor of the Carefree Park Florida loan just like you were?
A. Yes.
Q. Let me have this marked as the next exhibit, if I may.

Page 84

(Thereupon, the referred-to document was marked as Adib Nabhan Exhibit Number 10 for Identification by the court reporter.)
Q. (By Mr. Kirby) What's Exhibit 10?
A. It's Republic Security Bank promissory note.
Q. This is the note that reflects the loan from Carefree Park, by Carefree Park, excuse me, from Republic Security Bank in the amount of $1,780,000; isn't that correct?
A. That's correct.
Q. So Carefree Park, nine months after Fun Depot, Inc., was formed, was able to borrow almost 1.8 million from Republic Security Bank; right?
A. Yes.
Q. And why did Carefree Park borrow that money?
A. To improve the property.
Q. And it was with the proceeds of that loan that the 16,000 square foot game room was constructed; isn't that right?
A. No, 14.
Q. 14,000 square foot?
A. Yes.
Q. Let's go back to Exhibit 1, if we may,

Page 85

sir. Those are your interrogatory answers.
A. Yes.
Q. And let me direct your attention to page six. And if you want to take a minute to read the question on page five, that's fine.
A. Yes.
Q. You see in answer number three your interrogatory answer states that on the date of the answer, Fun Depot consisted of a 16,000 square foot game room containing approximately 200 games, merchandise and supplies. Do you see that, sir?
A. Yes.
Q. Was that a mistake? Is it only 14,000?
A. Yes, sir.
Q. So that should say 14,000?
A. Yes. It's an error.
Q. So is it the case, sir, that in 1996 Carefree Park took out a loan that funded the construction of this 14,000 square foot game room?
A. That's correct.
Q. Now, why would Carefree Park do that if it didn't own the game room?
A. Why?
Q. Yes. Why would Carefree Park borrow the money instead of Fun Depot, Inc.?

Page 98

Q. (By Mr. Kirby) And there was another 697,000 in sales that you could have deposited into Carefree Park, but you deposited into Fun Depot; is that right?
A. Yes.
Q. And you'll agree with me that if you had elected to deposit more of the arcade's revenues into the Carefree Park account, Carefree Park would have realized greater net income in 1997; right?
A. Let's go back to the original.
Q. Can we go back to my question, sir?
A. I going to go back to explain to you why that was deposited there. Why that was deposited there I'm going to answer your question. Florida operation supposed to be my responsibilities, supposed to take care of my family. Massachusetts operation supposed to take care of his family, so if I needed money in Carefree Park account, I deposit it there. If I need money in Fun Depo account, I deposit it there.
Q. I'm going to come back to my question because I don't think that's responsive, but in your last answer when you said Massachusetts was supposed to take care of his family, I take it by his you mean Amin's; is that right?
A. Amin's and the people who work for him.

Page 99

Q. Including your sister, Jamile, right, and your brother, George, right?
A. That's correct.
Q. So if I understand your testimony, the Massachusetts operations was supposed to take care of anybody else in the family other than you; is that right?
MR. VALLEY: Objection. That's not what he said.
THE WITNESS: That's not what I said. I had an agreement with my brother that he take care of Massachusetts operation and I'll take care of Florida operations, so he deposit the funds from Massachusetts operation where he wanted and I deposit the funds from Florida operations where I wanted.
Q. (By Mr. Kirby) Let me go back to the question I asked you a minute ago, sir. Isn't it the case that if you had deposited some of the $697,000 that you chose to deposit into the Fun Depot account, if you had instead deposited it into the Carefree Park account, Carefree Park would have realized more income in 1997?
A. Is that your question?
Q. Yes.
MR. VALLEY: I'll object. Go ahead and

Page 100

answer it. Are you just asking him if more income had been deposited in the Carefree Park Corporation's account it would have increased the operating income and, therefore, the net income?
MR. KIRBY: Correct.
MR. VALLEY: Based on Exhibit 7?
MR. KIRBY: Correct.
Q. (By Mr. Kirby) Isn't that self-evident, sir? Isn't that right, sir?
A. What's right?
Q. Isn't it the case that you decided --
Strike that.
You're the guy who, at the end of the day, in Florida collects all the receipts; right?
A. That's correct.
Q. You're the guy who actually has his hands on the cash; right?
A. That's correct.
Q. You're the guy who then gets to decide how much cash do I put into the Carefree Park account and how much cash do I put into Carefree Park account; right?
A. That's correct.
Q. You also are the guy who gets to decide

Page 101

which accounts in Florida are going to be used to pay for certain expenses; right?
A. That's correct.
Q. So you're the guy who, in 1997, decided to buy almost $250,000 worth of equipment from Brady in the name of Carefree Park; right?
A. Yes.
Q. You made that decision notwithstanding that a year earlier you had formed Fun Depot, Inc.; right?
A. Yes.
Q. Can we go back to Exhibit 9? That is the Carefree Park check register for its Florida account at Republic Bank.
A. Yes.
Q. Do you remember I asked you earlier whether it was true that in 1998, as had been the case in 1997, Carefree Park continued to buy equipment in Florida? Do you remember we went through those?
A. Yes.
Q. And it's true Carefree Park continued to buy equipment in 1998 just like it had in 1997; is that right?
A. Right.
Q. And that equipment that was purchased in

26 (Pages 98 to 101)

Page 118

THE WITNESS: Well, I looked for that and the others, I don't know if they're labeled properly with the equipment or not.
MR. VALLEY: Are there any that are labeled on Exhibit 12 as equipment other than the $2,600? That's what he wants to know.
THE WITNESS: No.
Q. (By Mr. Kirby) Okay. Do you have Exhibit 7 in front of you? That's the income statement from Carefree Park's Florida operations in 1997.
A. Yes.
Q. What I'd like to do is compare Exhibit 7 and 13 for just a moment.
A. Yes.
Q. In 1999, did you, as had been the case in prior years, determine how much arcade income to deposit into Carefree Park's bank account?
A. I don't believe I deposited any arcade income in Carefree Park.
Q. Well, if you go back to Exhibit 12, you'll see there are deposits that are entitled arcade income. Are you saying that's not really arcade income?
A. Which? Tell me which one.
Q. February 1st, for example, in the amount of $21,000. I think you testified that was a check from

Page 119

Fun Depot?
A. That was rent.
Q. That was rent. And how is the amount of the rent determined?
A. From Fun Depot to Carefree Park.
Q. Who set the rate?
A. Originally Amin and I set it for $5,000 a month.
Q. And when was that agreed upon?
A. 1988.
Q. And did that change at some point?
A. We never talk about increasing the rate or anything.
Q. Did you stop paying $5,000 a month at some point and start paying some different amount?
A. I pay whatever it needs to pay to cover the mortgage and the expenses on the property.
Q. Is it fair to say, Mr. Nabhan, that what you would do in terms of rent payments is collect all the rents from the other tenants on the property and then whatever shortfall existed in terms of the amount needed to pay the mortgage and the taxes and the utilities and the maintenance costs, that's how much rent you would have Fun Depot pay to Carefree Park?
MR. VALLEY: Objection. You can answer.

Page 120

THE WITNESS: Yes.
Q. (By Mr. Kirby) That's what you did; right?
A. Yes.
Q. And so in some years, if you collected more rent from other tenants on the property, Fun Depot's would be less than in other years?
MR. VALLEY: Objection.
Q. (By Mr. Kirby) Isn't that right, assuming the carrying costs stay the same?
A. The carrying costs always increases.
Q. Because the taxes go up?
A. Yes.
Q. Do Fun Depot's rent payments constitute fair market value rent based on your experience in the market?
MR. VALLEY: Objection.
Q. (By Mr. Kirby) That's a terrible question. Your objection's sustained, so let's try again.
You negotiate leases with tenants on the Lake Worth property; right?
A. Yes.
Q. And you tried to negotiate the highest rent that you can achieve for the space; right?
MR. VALLEY: Objection.

Page 121

THE WITNESS: Yes.
Q. (By Mr. Kirby) You want to make as much rental income as you can on the property; right?
A. Yes.
Q. And I take it you have a familiarity with fair market rental rates in that area; is that right?
A. Yes.
Q. And can you tell me what the average rental rate on a square foot basis is that any Carefree Park tenants, other than Fun Depot, are presently paying?
A. An average, $12 a square foot.
Q. And is that, in your experience in the market, the fair market rental rate for space of that type at this time?
MR. VALLEY: Objection. You can answer.
MR. KIRBY: That one's going to be overruled.
THE WITNESS: It depends on the size of the space.
Q. (By Mr. Kirby) And what you mean by that is smaller retail space is going to have a higher per square rental rate than a big arcade space?
A. That's correct.
Q. Do you have an opinion as to the fair

31 (Pages 118 to 121)

Page 130

A. I do.
Q. And on what basis did you set it? Was it based on how well the company was doing and how much money it could afford to pay you?
A. I really don't know why I did things the way I did. It's just I had to survive.
MR. VALLEY: He just wanted to know whether whatever salary you took from Carefree Park Corporation in 1995 was based on how well the corporation was doing or was it based on something else, if you recall.
THE WITNESS: The only thing I could have done there is just to survive, to pay my food and go to work.
Q. (By Mr. Kirby) Do you see in Exhibit 14 there are some purchases from Brady Distributors, for example, on February 6th and March 11th and some other dates?
A. You said February 6th?
Q. On February 6th.
A. What pages?
Q. On page 2696 towards the bottom.
A. Yes. I see that, yes.
Q. And there are some additional purchases later in the year from Brady Distributors. Do you see

Page 131

that?
A. I see that one, yes.
Q. So in '95 --
MR. VALLEY: Hold on. I think what he said is he saw the first one. He's looking to see the others.
THE WITNESS: I'm looking to see the others.
Q. (By Mr. Kirby) Okay. I misunderstood. Go ahead.
A. What's the other dates?
Q. March 11th, May 1st, May 14th, May 30th, June 17th, August 2nd, October 10th, October 16th and November 4th.
A. I see March 11th.
Q. My question simply is this, sir. Is it the case that in 1995 you were writing checks to Brady Distributors for the purchase of arcade equipment for Carefree Park?
A. Yes.
Q. Which is what you did in later years as well, as well we saw this morning; right?
A. Yes.
Q. Can I have this marked as the next exhibit, please?

Page 132

(Thereupon, the referred-to document was marked as Adib Nabhan Exhibit Number 15 for Identification by the court reporter.)
Q. (By Mr. Kirby) Can you identify Exhibit 15 for me, sir?
A. Yes, I can. It says Carefree Park Corporation equipment listing for 1995.
Q. And you see at the top there's a group under the caption Florida equipment?
A. Yes.
Q. And then the Massachusetts equipment is below that?
A. Yes.
Q. Did Carefree Park purchase the games listed under the Florida equipment heading?
MR. VALLEY: You mean was a check written out of Carefree Park's account for that equipment?
MR. KIRBY: Somebody had to pay for them; right?
MR. VALLEY: But is that what you're asking?
Q. (By Mr. Kirby) No, I'm asking who bought the Florida equipment?
A. I did.

Page 133

Q. Using what money?
A. Money I generate income from the game room.
Q. Carefree Park's game room; right?
A. 1995, yes.
Q. And what happened to this equipment after you formed Fun Depot, Inc., in February of 1996?
A. We continue using it.
Q. So Fun Depot used the equipment that Carefree Park had purchased?
MR. VALLEY: Objection.
Q. (By Mr. Kirby) Is that right?
MR. VALLEY: Objection. You can answer.
THE WITNESS: Yes.
Q. (By Mr. Kirby) And did Fun Depot pay Carefree Park for its use of the equipment that Carefree Park had purchased?
A. Yes.
Q. How did Fun Depot pay for its use of that equipment?
A. For services that Fun Depot provide Carefree Park.
Q. And what services are those? Are those the services that you talked about earlier today with respect to tenants on the property?