UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAREFREE PARK CORPORATION, AMIN NABHAN and JAMILE NABHAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>ADIB NABHAN,<br><br>        Defendant. | Civil Action No. 2003-CV-12426 RCL |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE THE TESTIMONY OF DAVID WUDYKA**

Plaintiffs Carefree Park Corporation ("Carefree Park"), Amin Nabhan ("Amin") and Jamile Nabhan ("Jamile") (collectively, "Plaintiffs") hereby oppose the motion in limine of defendant Adib Nabhan ("Defendant" or "Adib") to exclude the testimony of David Wudyka.

**INTRODUCTION**

Plaintiffs intend to call Mr. Wudyka as an expert on compensation to testify as to the reasonable salary that Adib should have received as manager of Fun Depot, Inc. ("Fun Depot"). Defendant argues that Mr. Wudyka's testimony should be excluded because it supposedly does not pass muster under *Daubert*. The motion in limine should be denied because, as detailed below, Mr. Wudyka is well-qualified as an expert on compensation, has gathered the best available information concerning salary levels paid to managers of entertainment facilities such as Fun Depot and will testify in accordance with reliable, well-established principles and methodology. Testimony about Adib's salary is highly relevant, moreover, because it will be essential to the jury's determination of the proper amount of damages to award Plaintiffs to

compensate them for Adib's breaches of fiduciary duty and misappropriation of Carefree Park's assets and corporate opportunity in Florida.

## BACKGROUND

Plaintiffs allege that Adib, who is the brother of Amin and Jamile, a shareholder of Carefree Park and director of Carefree Park until his removal in 2003, breached his fiduciary duty to the corporation, and to Amin and Jamile as fellow shareholders, by converting the family business in Florida, which had formerly been a part of Carefree Park, into a corporation, Fun Depot, in which he was the sole shareholder. Plaintiffs claim damages arising out of the breach, including their share of the profits of Fun Depot since its incorporation. Fun Depot is an arcade and game room in Lake Worth, Florida, which also includes batting cages and a go-cart track. In other words, it is in precisely the same business as Carefree Park.

In order to measure Fun Depot's profitability, it is necessary to identify its expenses, including the amounts paid as wages and salaries. The profitability calculation will be distorted, however, if Adib, as the sole operator of Fun Depot, paid himself an excessive salary and thereby reduced the company's profitability accordingly. Adib testified in his deposition that his function at Fun Depot is "taking care of the operations of Fun Depot and maintaining it." (Adib depo. at p. 93.) In effect, he serves as the manager of Fun Depot. Plaintiffs engaged Mr. Wudyka for the limited purpose of testifying as to what would be an appropriate level of compensation for someone (i.e., not an "insider" who sets his own salary) performing that role at a business such as Fun Depot.

As he states in the resume attached to his expert report, Mr. Wudyka has more than seventeen (17) years of experience as a human resources consultant with a specialty in compensation, particularly for small to mid-size companies. To provide the opinion that Plaintiffs requested in this case, Mr. Wudyka employed a method entitled "Market Pricing." As

2

set forth in the Affidavit of David Wudyka ("Wudyka Aff.") and the exhibits thereto filed herewith, the Market Pricing method of determining the appropriate pay level for a given position is an accepted and well-established method used by human resources professionals, is recognized by "World at Work," formerly the American Compensation Association, as a means for determining the appropriate levels of compensation for a wide variety of positions, and is regularly relied upon by employers in setting base pay levels. (Wudyka Aff., ¶¶ 2-5, and Exhibits A, B and C.)

The Market Pricing methodology employs industry pay survey data as the starting point for fixing appropriate compensation. To establish the pay level for Adib's position, Mr. Wudyka relied on a 1999 survey done for the International Association of Family Entertainment Centers ("IAFEC"). The IAFEC study was a 42-page study covering 48 separate organizations prepared by Industry Insights of Columbus, Ohio in accordance with the methods used by compensation professionals to assemble such data and can be confidently relied on to perform a Market Pricing analysis. (Wudyka Aff., ¶ 6.)

From among the various job descriptions available in the IAFEC study, Wudkya determined that the one that best described Adib's function, as testified to in his deposition, was "General Manager of Entertainment Center." In 1999, the average base pay rate for that position nationwide was $33,700. Because his report was prepared in 2004, Mr. Wudyka adjusted the 1999 level to account for the passage of time through a process known as "aging the data" which simply involved using a multiplier approximating the typical merit pay increase across all companies during the relevant time period, which Mr. Wudyka determined to be 4%. Mr. Wudyka states in his affidavit that the process of aging the data is a commonly employed method for updating pay survey data to reflect current marketplace conditions. (Wudyka Aff., ¶ 7.)

The Market Pricing methodology, including the aging of the data, produced a predicted base rate for Adib's position in 2004 of $43,500. Mr. Wudyka next used information from a website called Salary.com as a check on the market pricing calculation. Salary.com is an internet website that compiles salary data and that is relied upon by compensation professionals. (Wudyka Aff., ¶ 8.) The website did not have a category precisely equivalent to the one in the IAFEC report, but it did have information for the comparable positions of "Retail Store Manager" and "Coin Room Manager-Casino" which was specific to the Lake Worth area and up-to-date as of the time of the report. Those two positions were listed in Salary.com at $42,100 and $43,000 respectively, which served to confirm the accuracy of Mr. Wudyka's report and his opinion that an appropriate salary level for Adib's position in 2004 would be $43,500.

## ARGUMENT

Federal Rule of Evidence 702, as amended in December 2000, provides that expert opinion testimony is admissible "if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." Expert testimony is admissible if it is both relevant and reliable. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct . . . It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). Although the expert's opinion must therefore rest on a "reliable foundation," *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), "[t]he ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." *Cippollone v. Yale Industrial*

*Products*, 202 F.3d 376, 380 (1st Cir. 2000). Expert testimony must be relevant "in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81. Any doubts about relevance should be resolved in favor of admissibility. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1242 (E.D.N.Y. 1985). In ruling on a similar motion to exclude expert testimony, Judge Stearns of this Court noted that, "[d]efendant's motion in limine misapprehends the judge's limited gatekeeping role under *Daubert* . . .

> It is not the function of the court to determine whether the plaintiff's expert did everything that an expert could do in coming to his conclusion, or whether every piece of information he relied upon was indisputably true and accurate. These are considerations that may influence the jury's determination as to which expert to believe at trial, but are not part of the court's threshold inquiry. Rather, it is the court's duty first to confirm that the testimony is relevant, and second, to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

*L.B. Corporation, v. Schweitzer-Mauduit International, Inc.*, 121 F. Supp. 2d 147, 155 (D. Mass. 2000).

Here, Mr. Wudyka's testimony rests on a reliable foundation. He has extensive experience as a compensation consultant and with the application of the Market Pricing technique. Market Pricing is a methodology that is widely accepted among compensation professionals as a means of determining on behalf of their clients what salaries and wages are appropriate. (Wudyka Aff., ¶¶ 2-5.) Employers rely on such data in setting their employees compensation levels. (*Id.*, ¶ 2.) The Supreme Court in *Daubert* stated that one factor a court may consider with regard to reliability of a given methodology is the level of the technique's acceptance within a particular discipline. *Daubert*, 509 U.S. at 593-94. Although the Court identified other factors as well, such as whether a technique has been subject to peer review or

5

testing, those factors are clearly more relevant to experts in the so-called "hard sciences" than in the social sciences. *See* Fed. R. Evid. 702 advisory committee notes to the 2000 amendments ('Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference other standard principles attendant to the particular area of expertise.").

The IAFEC study is a reliable source of raw material for a Market Pricing analysis. Courts have frequently admitted expert testimony based on such surveys, particularly in cases, not dissimilar to this one, where the issue is whether the amount of executive compensation paid to the chief executive officer of a close corporation is a disguised form of dividend that should not be allowed under the tax code. *See, e.g., Eberl's Claim Service, Inc. v. Commissioner of Internal Revenue*, 249 F.3d 994, 1003 (10th Cir. 2001)(where IRS's expert relied on two surveys of comparable salaries as basis for his opinion concerning compensation paid to insurance executive, tax court properly relied on one of them in concluding that salary was excessive); *Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner of Internal Revenue*, 528 F.2d 176, 183 (10th Cir. 1975) (taxpayer and government in tax court both relied upon as a source of salary information a survey of the soft drink industry published by National Soft Drink Association). In *Matter of the Adventure Bound Sports, Inc.*, 858 F. Supp. 1192, 1200 (S.D Ga. 1994), a wrongful death case, the court noted that "Petitioner's expert, Dr. Bart, relied on national studies setting out the average starting salary a person of similar educational level, experience, age and gender could attain. The Court agrees with and adopts Dr. Bart's estimate . . ." The survey relied upon here is clearly a definitive source for information concerning salaries in the admittedly narrow niche of occupations in the arcade and game room industry, and Mr. Wudyka was correct to use it in his analysis.

6

Mr. Wudyka was also correct to "age" the data in order to bring the most recent information available forward to the date of his report. Indeed, defendant would undoubtedly have objected if Mr. Wudyka had contended that the 1999 figure did not have to be adjusted to take into account the five year lapse of time. Contrary to Adib's contention, there is nothing improper about making such an adjustment or extrapolation; as the Supreme Court has noted, "[t]rained experts commonly extrapolate from existing data." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Adib claims here that what Mr. Wudyka has done is not extrapolate but rather issue an opinion based on his own arbitrary "ipse dixit." He only reaches that conclusion, however, by misrepresenting the process that Mr. Wudyka went through. Mr. Wudyka did not, as Adib suggests, use the process of aging the data as an arbitrary device to reconcile some otherwise irreconcilable difference between the figures he derived from the IAFEC study and the information he found at Salary.com. He instead found the right job description in the IAFEC study, which was far more detailed and precise in its categorization, and then performed a reasonable and necessary adjustment to bring the information he found there up to date. Having determined through that process that the appropriate salary level was $43,500 per annum, he then went to Salary.com, which had less specific job descriptions, but was current and specific to the Lake Worth area. He determined through that calculation that roughly equivalent jobs, i.e. Retail Store Manager and Coin Room Manager-Casino, paid $42,100 and $43,000 per annum respectively. He then compared those figures with the $43,500 per annum amount derived from the IAFEC study as a check on his earlier calculation. The fact that the numbers arrived at through the two different processes are so close is indicative not of Mr. Wudyka's having made some arbitrary adjustment based on his own *ipse dixit*, but rather of the accuracy and legitimacy of the market pricing technique as applied to the IAFEC study and the facts of this case.

Finally, there can be no doubt that Mr. Wudyka's analysis is relevant to this case and will be helpful to the jury which, if it determines that a breach involving misappropriation of assets and theft of corporate opportunity has occurred, will need to determine the extent of the damages that Plaintiffs have suffered as a result of that breach. Indeed, it seems clear that the real purpose behind Adib's present motion is not to question the accuracy or value of Mr. Wudyka's analysis for its own sake, but to try to remove an essential element from the analysis done by Richard Maloney of the extent of Fun Depot's profitability, and thus of Plaintiffs' loss, over the period of almost the last ten years. The Court should not permit Adib to deprive the jury of information that will be vital to the calculations that it must perform at the conclusion of this case.

## CONCLUSION

For the foregoing reasons, Defendant's Motion in Limine to Exclude the Testimony of David Wudyka should be denied.

CAREFREE PARK CORPORATION,
AMIN NABHAN and JAMILE NABHAN,

By their attorneys,

_____
Robert L. Kirby, Jr. (BBO #550538)
Gordon M. Jones, III (BBO # 549016)
Nixon Peabody LLP
100 Summer Street
Boston, MA  02110-2131
(617) 345-1000

Dated:  January 27, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail and electronic mail on January 27, 2006.

_____
Robert L. Kirby, Jr.

8