UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                               )
CAREFREE PARK CORPORATION,      )
AMIN NABHAN AND JAMILE NABHAN   )
                               )
          Plaintiffs,          )
                               )          CIVIL ACTION NO.
v.                             )          03-12426 RCL
                               )
ADIB NABHAN                     )
                               )
          Defendant.           )
_____)

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION AND MEMORANDUM IN SUPPORT FOR A NEW TRIAL ON THE ISSUE OF
WHETHER PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF
LIMITATIONS**

Defendant, Adib Nabhan ("Defendant" or "Adib"), submits this
Opposition to Plaintiffs Carefree Park Corporation ("Carefree
Park"), Amin Nabhan ("Amin") and Jamile Nabhan's ("Jamile" and
collectively "Plaintiffs") Motion and Memorandum in Support for a
New Trial on the Issue of Whether Plaintiffs' Claims are Barred
by the Statute of Limitations ("New Trial Motion").  For the
reasons set forth herein, and in Defendant's concurrently filed
Opposition to Plaintiffs' Motion and Memorandum in Support of
Renewed Motion for Judgment as a Matter of Law or, in the
Alternative, for a New Trial, the New Trial Motion should be
denied.

### I.    INTRODUCTION

In an attempt to defeat the jury's verdict in favor of Adib,
Plaintiffs not only malign the Court's jury instructions
concerning agency and the triggering of the statute of
limitations but argue that the jury's verdict was not supported

by sufficient evidence.  *See* Pltfs Mot. at 2-8.[1]  The crux of
Plaintiffs' argument is that, as matter of law, the jury should
not have been instructed that actual notice provided to Carefree
Park's accountant, Michael LeClerc ("LeClerc"), was imputable to
Plaintiffs and that there was not sufficient evidence to support
a finding that LeClerc was Carefree Park's agent acting within
the scope of his employment when he received actual notice of Fun
Depot, Inc.'s ("Fun Depot") corporate structure.  *See* Pltf's Mot.
at 1.  Plaintiffs' proposition is legally and factually
incorrect.

      In its instructions to the jury, the Court correctly
delineated the factual issues for the jury to resolve to make a
determination about actual knowledge and the statute of
limitations, including: (1) LeClerc's status as agent; (2)
whether he was acting within the scope of his authority when he
received actual notice; and (3) whether LeClerc actually knew
that Adib was the sole owner and shareholder of Fun Depot prior
to October 3, 2000.  Specifically, the Court instructed as
follows:

      "Corporations can only act through agents.  An agent is
      someone who acts on behalf of the corporation.  Under
      the circumstances I will explain momentarily, knowledge
      acquired by an agent of the corporation is knowledge
      acquired by the corporation itself.  The defendant
      claims, among other things, that Michael LeClerc,
      Carefree Park's accountant, was an authorized agent of
      Carefree Park and that he knew before October 3, 2000,
      that Adib had incorporated Fun Depot as a Subchapter-S
      corporation of which he was the only shareholder.  If
      you find that Mr. LeClerc was an agent of Carefree
      Park; that it was within the scope of the authority

---

[1]  All references herein to "Pltfs' Mot. at____" refer to the New Trial
Motion.

granted to him by Carefree Park and important to the
work he was authorized to do for Carefree Park that he
understood the ownership and tax status of Fun Depot;
and that he knew before October 3, 2000 that Fun Depot
was incorporated by Adib as a Subchapter-S corporation
of which Adib was the sole shareholder, Carefree Park
is deemed to have that knowledge (emphasis added)."

*See* Jury Instructions at p. 17.

Plaintiffs' argument that the actual knowledge of an agent
cannot be imputed to a principal in a breach of fiduciary duty
case is simply wrong.  Actual knowledge of an agent <u>is</u> imputed to
a corporation even in cases where there has been a breach of
fiduciary duty.

When all of the evidence is viewed in a light most favorable
to Adib, as it must be, Plaintiffs have failed to demonstrate
that the jury could not reasonably conclude that Plaintiffs'
claims were barred by the statute of limitations.  The jury
correctly resolved those issues in Adib's favor, and the verdict
should not be disturbed.[2]

## II.   <u>LEGAL STANDARD</u>

Fed. R. Civ. P. 59 provides that a trial court may set aside
a verdict and order a new trial only if, in its opinion, "the
verdict is against the clear weight of the evidence, is based
upon evidence that is false, or resulted from some trial error
and amounts to a clear miscarriage of justice."  *See, e.g.,*
*Payton v. Abbott Labs*, 780 F.2d 147, 152 (1st Cir. 1985).  In an

---

[2]  Plaintiffs' argument that the "<u>only</u> possible basis for the jury's verdict
on the statute of limitations" was its belief that LeClerc learned of the
alleged breach prior to October 3, 2000, is not supported by the evidence.
*See* Pltfs' Mot. at 3.  At trial there was ample evidence from which a juror
could form the reasonable belief that Amin and/or Jamile knew about Fun
Depot's corporate structure before October 3, 2000 from documents Plaintiffs
had in their possession and conversations they had with Amin.

early case involving Fed. R. Civ. P. 59, the Supreme Court stated:

> "The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and <u>may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury</u> (emphasis added)."

*See, e.g., Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

In deciding the New Trial Motion, the evidence must be considered strongly in favor of the verdict, and all inferences that support the verdict must be taken into consideration. *See Totsi v. Ayik*, 394 Mass. 482 (1985), *appeal after remand*, 400 Mass. 224, *cert. denied*, 484 U.S. 964 (1987). Only when <u>no</u> rational view of the evidence warrants a finding that the moving party is liable may the Court take the matter from the jury. *See, e.g., Foster v. Loft, Inc.*, 26 Mass. App. Ct. 289, 292 (1988).

Here, the facts speak for themselves. Plaintiffs cannot show that the jury's verdict goes against the clear weight of the evidence. It simply did not. The jury's verdict was based on uncontroverted evidence, including undisputed testimony about LeClerc's agency and the fact that he received actual notice that Fun Depot was incorporated as an S Corporation and that Adib was its sole shareholder prior to October 3, 2000. As such, the jury's verdict should not be set aside and a new trial should not be granted.

4

## III. THE COURT'S JURY INSTRUCTION WAS CORRECT AS A MATTER OF LAW

Plaintiffs argue that, as a matter of law, the Court's jury instruction on the statute of limitations was incorrect. *See* Pltfs' Mot. at 3-8. The crux of Plaintiffs' argument is that where there has been a repudiation of trust, an agent's actual knowledge is imputed to the principal as constructive knowledge and that, under Massachusetts law, constructive knowledge is not enough to start the statute of limitations running. In so arguing, Plaintiffs attempt to muddle and conflate distinct legal principals governing breach of fiduciary and agency. Their position is, therefore, untenable.

Defendant does not dispute that in repudiation of trust cases in Massachusetts the statute of limitations begins to run when the beneficiary has actual notice of the breach. *See* *Lattuca v. Robsham*, 442 Mass. 205 (2004). Plaintiffs, however, take that notion one step too far. Plaintiffs argue (without citing any controlling legal authority) that in repudiation of trust cases, an agent's actual knowledge is not imputed to the principal as actual knowledge but, instead, that it is somehow lessened and changed into constructive notice. However, the principal in this case is a corporation, which can only act through its agents. Thus, knowledge by Carefree Park's agent, whether it be Amin or LeClerc, is actual knowledge by Carefree Park.

Contrary to Plaintiffs' contention, it is beyond dispute that an agent's actual notice is imputed to the principal as actual notice – regardless of the underlying cause of action.

5

*See, e.g.*, *Newhall v. Posner*, 2004 WL 413275 (D. Mass. 2004)
(plaintiff's claim was time-barred because he was bound by the
knowledge of his accountant/agent); *National Credit Union Admin.
v. Ticor Title Ins. Co.*, 873 F. Supp. 718, 726 (D. Mass. 1995)
("[T]he general rule under Massachusetts law is that the
knowledge of directors, officers and agents acquired in the
course of official duties is imputed to the corporation" *citing
Sperry Rand Corp. v. Hill*, 356 F.2d 181, 186 (1st Cir. 1966));
*First Nat. Bank of Cicero v. United States*, 653 F. Supp. 1312
(N.D. Ill. 1987) (whatever knowledge agent acquires within the
scope of his authority is imputed to principal); *Demoulas v.
Demoulas*, 1995 WL 476763  *3 (Mass. Super. 1995) (agent's actual
knowledge is imputed to the principal and starts statute of
limitations running).  In relevant part, the Restatement (Second)
of Agency states as follows:

> (1) Unless the notifier has notice that the agent has
> an interest adverse to the principal, <u>a notification
> given to an agent is notice to the principal if it is
> given</u>:
> (a) <u>to an agent authorized to receive it</u>; or
> (b) <u>to an agent apparently authorized to receive it</u>; or
> (c) to an agent authorized to conduct a transaction,
> with respect to matters connected with it as to which
> notice is usually given to such an agent, unless the
> one giving the notification has notice that the agent
> is not authorized to receive it….(<u>emphasis added</u>).

*See* Restatement (Second) of Agency, §268 (1958).

Moreover, concerning legal imputation, the Restatement (Third) of
Agency (Tentative Drafts) states in relevant part:

> "For purposes of determining a principal's legal
> relations with a third party, <u>notice of a fact that an
> agent knows or has reason to know is imputed to the
> principal if knowledge of the fact is material to the
> agent's duties to the principal</u>, unless the agent

> (a) acts adversely to the principal as stated in §
> 5.04, or
> (b) is subject to a duty to another not to disclose the
> fact to the principal (emphasis added).

*See* Restatement (Third) Of Agency § 5.03 (T.D. No. 6, 2005).

Plaintiffs argue, incorrectly, that in Massachusetts "disclosures made to an agent [are], as a matter of law, constructive knowledge." *See* Pltfs' Mot. at 4. To the contrary, as the Restatement (Second) of Agency, the Restatement (Third) Agency and the great weight of Massachusetts authority make clear, whatever type of notice the agent possesses – whether it be actual or constructive – it is imputed to the principal. *See, e.g., Demoulas*, 1995 WL 476763 *3 (agent's actual knowledge is imputed to principal).[3] In *Newhall v. Posner*, 2004 WL 413275 (D. Mass. 2004), one of the cases cited by the Court in its Jury Instruction, defendants moved for summary judgment on the ground that plaintiff failed to file his accounting malpractice action within the time allowed by M.G.L. c. 260, § 4 (2003). *Id.* at * 1. In granting defendant's motion, the Court found that the knowledge of plaintiff's agent was imputed to plaintiff and that his claims were barred by the statute of limitations. *See id.* at * 3 (*citing* the Restatement of Agency).

The fact that this case involves an alleged repudiation of trust does not change Newhall's applicability. In this case, undisputed testimony established that LeClerc was authorized to

---

[3] The cases cited by Plaintiffs are not to the contrary. For example, in *Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Failky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997), the Court stated, specifically, that "[U]nder agency principles, notice to a corporation's agent is notice to the corporation."

prepare tax returns and financial statements for Carefree Park and tax returns for Amin and Jamile.  In order to prepare Plaintiffs' tax returns and financial statements, LeClerc needed to collect material information about Fun Depot's corporate and tax structure and was authorized by Amin to do so.  When LeClerc learned of Fun Depot's corporate structure in 1997, 1998 and 1999, he was an agent of Carefree Park's and Amin's, and his knowledge is considered direct knowledge by Carefree Park and Amin.  Plaintiffs may not now deny actual notice simply because LeClerc may have failed to communicate his knowledge to the Plaintiffs.  See Restatement (Third) of Agency § 5.03 (T.D. No. 6, 2005) (Comment B).

Moreover, all of the cases cited by Plaintiffs in their New Trial Motion are easily distinguishable.  In Sunrise Properties, the Court held that knowledge of an agent was imputed to the principals, despite the fact that the agent was acting adversely to them.  425 Mass. at 67.  In so holding, the Court found that the agent was acting within the scope of his employment when he obtained actual notice.[4]  Id. at 66-68.  Despite Plaintiffs' contention to the contrary, there is nothing in Sunrise Properties that renders it inapplicable to the case at hand. Here, LeClerc testified that he was authorized to receive Fun Depot's tax information and prepare tax returns and financial statements for Carefree Park as well as the individual

---

[4] The Court's holding in Sunrise Properties is entirely consistent with the principles of agency law.  As discussed above, the Restatement (Second) of Agency states that notice to an agent is imputed to the principal when, inter alia, the agent is authorized to receive it or the agent is apparently authorized to receive it.  See Restatement (Second) of Agency, §268 (1958).

Plaintiffs. *See* LeClerc Tr. at 6:6-6:20).[5]  As such, the holding in *Sunrise Properties* is clearly controlling.

Plaintiffs' reliance on *Puritan Medical Center, Inc., v. Cashman*, 413 Mass. 167 (1992), is similarly misplaced.  In *Puritan*, a group of doctors practicing in a close corporation brought suit against one of the company's stockholders who had been in charge of the financial and administrative operations and who was found by a jury to have charged the plaintiffs excessive rent and misappropriated a corporate opportunity. *See id.* at 174.  Unlike this case, the shareholder in *Puritan* had purposefully provided the company's accountants with incorrect information in order to conceal his duplicitous behavior. *Id.* In upholding the jury's verdict, the Court specifically noted that "most of the critical information with regard to rent was kept under lock and key" and that the "accounting reviews were a mere compilation, which relied wholly on the [incorrect] figures supplied to the accountants". *Id.* at 174.  As such, in *Puritan*, the accountants never received actual notice of the shareholder's fraud.  In this case, LeClerc admitted (and his testimony was not disputed) that he received notice of Adib's sole ownership of Fun Depot in 1997, 1998 and again in 1999.

Lastly, *Latucca v. Robsham*, 442 Mass. 205 (2004), on which Plaintiffs heavily rely, did not involve an agent's notice at all.  Instead, *Latucca* involved a claim for breach of fiduciary

---

[5]  The question of whether an individual is acting within the scope of his or her employment is a question of fact to be determined by the jury. *See, e.g., DeVaux v. American Home Assur. Co.*, 387 Mass. 814, 818 (1983).  Here, as the jury instructions required, the jury correctly determined that LeClerc was acting within the scope of his authority when he learned about Fun Depot's corporate structure in 1997, 1998 and 1999.

duty where defendant argued that the plaintiff "could have" investigated the trust's finances sooner and, if she had, would have discovered defendant's breach. 442 Mass. at 213. Although irrelevant for the purposes of this New Trial Motion, the *Latucca* Court held that constructive knowledge is insufficient to start the statute of limitation running in a case that involved a breach of a fiduciary duty. *Id*. Since this case involves an agent who had actual notice of the alleged breach, the holding in *Lattuca* is inapposite.

## IV.  **THE JURY'S VERDICT IS SUPPORTED BY SUFFICIENT EVIDENCE**

Given the foregoing, the Court's instruction was entirely correct and proper as a matter of law. Moreover, Plaintiffs have failed to demonstrate that the jury could not reasonably conclude that Plaintiffs' claims were barred by the three-year statute of limitations.

At the close of trial, the Court properly denied Plaintiffs' motion for a directed verdict, leaving the jury to decide whether Plaintiffs' Complaint was untimely filed. In deciding the statute of limitations question, the jury was asked to decide three factual issues: 1) whether LeClerc was Carefree Park's agent; 2) whether LeClerc was acting within the scope of his agency when he received actual notice; and 3) whether LeClerc had actual knowledge prior to October 3, 2000, three years before the lawsuit was filed. *See* Jury Instructions at 18. These three issues presented central factual questions for the jury, all of which were correctly resolved in Adib's favor.

10

a. **There Was Ample Evidence Showing That LeClerc Was Carefree Park's Agent**

The jury was presented with overwhelming evidence that LeClerc was Carefree Park's agent.  When the Court denied Plaintiffs' motion for directed verdict at the close of evidence, it correctly held that there was sufficient evidence for the jury to determine whether LeClerc was Carefree Park's agent. Additionally, the jury also made the factual determination that an agreement between Amin and LeClerc existed which created a principal-agent relationship.

The Restatement (Second) of Agency defines agency as follows:

(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
(2) The one for whom action is to be taken is the principal.
(3) The one who is to act is the agent.

*See* Restatement (Second) of Agency, § 101 (emphasis added).

In this case, there is uncontroverted testimony that LeClerc was authorized to act on Carefree Park's behalf in preparing the company's tax information and financial statements.  The testimony and supporting evidence also showed that LeClerc knowingly accepted that responsibility and with Amin's express authorization sought out the information needed to accomplish this task.[6]  In this regard, Amin testified as follows:

---

[6]  Plaintiffs' argument that LeClerc did not have the "authority, responsibility, or professional competence to advise the corporation…" is contrary to the trial testimony.  *See* Pltf's Mot. at 9.  As discussed in

11

    **Q.   By the way, who are Carefree Park Corporation's
          accountants?**
    A.   Bigelow and Company.
    **Q.   How long have they been the accountants for the
          corporation?**
    A.   I think early '80s or maybe mid '70s.  I'm not sure.
    **Q.   So for quite a while?**
    A.   Yes.
    **Q.   Who's your primary contact with Bigelow and Company?**
    A.   Mike LeClerc.
    **Q.   How do you spell his last name?**
    A.   C-l-e-r-c.
    **Q.   It's LeClerc?**
    A.   I believe so.
    **Q.   How long has he been your primary contact with your
          accountant?**
    A.   Since he started sometime in the '80s.

*See* Amin Tr. (2/23/06) 28:17-29:8.

Additionally, in regard to the creation of an agent-principal

relationship, Amin testified as follows:

    **Q:   You were aware that after Fun Depot, Inc., was
          incorporated that Fun Depot, Inc.'s accountants and
          Carefree Park Corporation's accountants talked with each
          other and exchanged information, correct?**
    A.   Yes.
    **Q.   And you authorized that, correct?**
    A.   Yes.

*See* Amin Tr. (2/23/06) 26:15-26:21.

    LeClerc also testified that he was responsible for preparing

Plaintiffs' tax returns and financial statements.  Specifically,

LeClerc testified as follows:

    **Q:   What is your relationship to Carefree Park Corporation?**
    A:   I am the in-charge accountant of their account at ---
          and I prepare their tax returns and sometimes financial
          statements.
    **Q:   For what period of time did you on behalf of Carefree
          Park prepare financial statements?**

_____

greater detail below, LeClerc, as Carefree Park's accountant, was responsible
for advising Plaintiffs about Fun Depot's tax status and corporate structure.
In order to fulfill that duty, he was required to seek out necessary
information from third parties.  LeClerc was specifically charged with the
duty of learning about Fun Depot's corporate structure and, therefore, he
clearly had the "authority, responsibility, or professional competence" to
advise Amin and Carefree Park.

> A:  I would estimate it at around 12, 13 years.
> **Q:  When was the last year that you assisted Carefree Park**
> **in preparing a financial statement?**
> A:  I believe that was December 31, 2002.
> **Q:  And you also assist in preparing the tax returns for**
> **the corporation; is that correct?**
> A:  That is correct.
> **Q:  Did you do any work tax-wise for any individuals**
> **associate with Carefree Park?**
> A:  Yes, I do.
> **Q:  For whom do you prepare tax returns?**
> A:  I prepare Amin Nabhan's personal tax returns as well as
> Jamile Nabhan's personal tax return.
> **Q:  How long have you been working on the Carefree Park**
> **account?**
> A:  I would estimate about 15 years.

*See* LeClerc Tr. at 4:16-5:10.

Amin's and LeClerc's testimony leave little doubt that

LeClerc was authorized to collect and receive information about

Fun Depot's corporate structure and that he knowingly accepted

that responsibility.  In addition to Amin's and LeClerc's

testimony, however, Fun Depot's accountant, Craig Petersen

("Petersen"), also testified about LeClerc's role as Plaintiffs'

agent.  In this regard, Petersen testified as follows:

> **Q:  During the course of your employment for Fun Depot, Inc.**
> **have you ever had contact with any accountant for**
> **Carefree Park Corporation?**
> A:  Yes, I have.
> **Q:  Who have you had dealings with?**
> A:  His name was Michael LeClerc I think it is.
> **Q:  Do you know with what company Mr. LeClerc is associated?**
> A:  I can't remember the name of his firm, no.
> **Q:  Do you recall the period of time when you first had**
> **contact with Mr. LeClerc who was an accountant for**
> **Carefree Park Corp.?**
> A:  Yes.
> **Q:  When do you recall first having contact with Mr.**
> **LeClerc?**
> A:  I believe it was around 1996 or 1997.
> **Q:  And what was your understanding of the services that Mr.**
> **LeClerc performed for Carefree Park Corporation?**
> A:  His services were to prepare on the other end Carefree
> Park's financial statements and tax returns and so
> forth.
> **Q:  And do you know for whom he prepared tax returns?**

A: Do I know -- can you ask the question again?
**Q: Yes.  Do you know for whom Mr. LeClerc prepared tax returns as opposed to financial statements?**
A: He prepared for Carefree Park and Eddie's brother and sister.

*See* Petersen Tr. at 9:10-10:8.

The Restatement (Second) Agency explains that:

"The relation which the law calls agency does not
depend upon the intent of the parties to create it, nor
their belief that they have done so. To constitute the
relation, there must be an agreement, but not
necessarily a contract, between the parties; if the
agreement results in the factual relation between them
to which are attached the legal consequences of agency,
an agency exists although the parties did not call it
agency and did not intend the legal consequences of the
relation to follow (emphasis added)."

*See* Restatement (Second) of Agency, § 101 (Comment).

Plaintiffs' argument that LeClerc's actual knowledge is not

imputable to Carefree Park simply because he did not "know" to

pass the information along to Amin is specious at best.

## b. LeClerc Was Acting Within The Scope Of His Employment When He Learned About Fun Depot's Corporate Structure

Next, Plaintiffs argue unconvincingly that LeClerc was not

acting within the scope of his employment when he received actual

notice that Adib was the sole shareholder and owner of Fun Depot

before 2000. *See* Pltfs' Mot. at 8-10.  Plaintiffs' contention is

completely unsupported by the evidence.

Tellingly, Plaintiffs do not argue, nor could they, that

LeClerc did not receive actual notice of Fun Depot's corporate

structure, nor do they argue that the information provided to

LeClerc was incorrect or inadequate.  Similarly, Plaintiffs do

not contend, nor could they, that the notice provided to LeClerc

14

himself was constructive instead of actual.[7]   Instead, Plaintiffs
argue that LeClerc was not an agent acting within the scope of
his employment when he received actual notice.   Plaintiffs are
wrong.[8]

It is beyond dispute that LeClerc was charged with the
responsibility of preparing Carefree Park's financial statements
and corporate tax returns as well as Amin's and Jamile's
individual tax returns.   It also beyond dispute that in order to
prepare Plaintiffs' financial statements and tax returns, LeClerc
was authorized to go out and seek the information needed to
accomplish that task. In this regard, LeClerc testified as
follows:

> **Q:** **Now, as part of your duties in preparing tax returns**
> **and financial statements for Carefree Park Corporation**
> **did you obtain information from sources outside the**
> **company?**
> **A:** There is third-party documentation that will
> substantiate the numbers for us, yes.
> **Q:** **And did you understand that part of your job was to**
> **obtain third-party substantiation in order for you to**
> **prepare financial statements for Carefree Park**
> **Corporation?**
> **A:** Amin provided me with that information.
> **Q:** **Did he authorize you to go out and get it from other**
> **sources?**
> **A:** If he couldn't provide it, yes, there were occasions
> where he would instruct me on who to contact to get
> that information.
> **Q:** **And you understood that you were authorized to go out**
> **and get that information?**

---

[7] Plaintiffs make a passing reference to the "constructive notice" that
LeClerc received.  *See* Pltf's Mot. at 9.  Plaintiffs' off-the-cuff remark
should be discounted.  Nowhere in their brief do Plaintiffs' seriously
contend that LeClerc only received constructive notice instead of actual
notice.

[8] The issue of whether (or not) an agent is acting within the scope of his or
her authority is a question of fact to be determined by the jury.  *See, e.g.*,
*DeVaux*, 387 Mass. at 818.  Here, the jury correctly and specifically decided
that LeClerc was acting within the scope of his authority when he received
actual notice.

> A:   Yes.
> Q:   **And you actually did that as part of the work that you**
>      **performed for Carefree Park Corporation, that is,**
>      **contacted third parties to obtain information; is that**
>      **correct?**
> A:   That is correct.

*See* LeClerc Tr. at 6:6-6:20.

Additionally, in describing the information that LeClerc

sought out in order to prepare Plaintiffs' tax returns, LeClerc

testified as follows:

> Q:   **Would you describe what the first page of Exhibit 52**
>      **is?**
> A:   That is a cover sheet from Mr. Petersen, the Florida
>      account (sic) for Fun Depot, and covering (sic) the
>      enclosed information for which he --- I would assume he
>      mailed or faxed to me at that time……
> Q:   **Do you recall receiving Exhibit 52 from Mr. Petersen?**
> A:   Yes, I do.
> Q:   **And do you recall receiving the attachments that came**
>      **with this cover letter?**
> A:   Upon receipt I would have made sure that everything he
>      said there was there.
> Q:   **And did you receive this information from Mr. Petersen**
>      **– did you understand you were receiving it as part of**
>      **the scope of your duties that you were performing for**
>      **Carefree Park Corporation?**
> A:   Yes.
> Q:   **And you were authorized to receive this kind of**
>      **information, correct?**
> A:   Yes, I was.
> Q:   **And Mr. Amin Nabhan authorized you to receive this kind**
>      **of information?**
> A:   Yes, he did (emphasis added).

*See* LeClerc Tr. at 7:13-8:4.

LeClerc's testimony shows, unequivocally, that he was acting

within the scope of his employment when he received actual notice

of Fun Depot's corporate structure.

c.   **LeClerc Had Constructive And Actual Notice Of Fun Depot's Corporate And Tax Structure Prior To October 3, 2000**

It is also beyond dispute that LeClerc received constructive and actual notice of Fun Depot's corporate structure prior to October 3, 2000, three years before this lawsuit was filed.

At trial, it was shown that Petersen sent LeClerc detailed financial information for Fun Depot in 1997. *See* Trial Exh. 52. The financial records provided to LeClerc clearly put him on notice that Fun Depot was set up as an S Corporation and that Plaintiffs had no ownership interest in the company.  In regard to providing LeClerc with Fun Depot's financial documents, Petersen testified as follows:

> Q:   **Mr. Petersen, I've -- our computer expert guru here has put up the first page of Exhibit D [Trial Exhibit 52]. Do you recognize that page?**
> A:   Yes, I do.
> Q:   **What is that page, that first page?**
> A:   That letter was a letter that I wrote to Mike in 1997 based upon a conversation I had with Mike on information that he requested from me regarding Fun Depot, Inc.  In it he was asking for the general detail and the financial statements of Fun Depot, Inc., depreciation schedule, and the commercial note agreement with Centura I believe was somebody there was a note with had sent that with attached documents.
> Q:   **And I note that the signature at the bottom is cut off. Do you see that?**
> A:   Yes.
> Q:   **Do you recall signing this letter and sending it to Mr. LeClerc?**
> A:   Yes.
> Q:   **And did you send attachments with this letter?**
> A:   Yes, I did.
> Q:   **And could we turn to page 2 of this exhibit?  Did you also send Mr. LeClerc the statement of assets, equities, and liabilities of Fun Depot, Inc.?**
> A:   That is correct.
> Q:   **And all the pages that follow thereafter in this exhibit, did you, in fact, send those to Mr. LeClerc?**
> A:   Yes, I did.

*See* Petersen Tr. at 11:2-12:2.

Similarly, LeClerc admitted that he had constructive notice
in 1997 and testified as follows:

> **Q:  Mr. LeClerc, do you have that portion of page 5 of page
>      (sic) 52 before you?**
> A:   Yes, I do.
> **Q:  And without reading it verbatim to the jury, what does
>      that information tell you or what did you understand it
>      to mean?**
> A:   Understand it to mean now?
> **Q:  Well, what do you understand it to mean?  Correct.**
> A:   That Fun Depot is an S corporation, a small business
>      corporation.

*See* LeClerc Tr. at 8:14-8:20.

In addition to constructive notice, however, LeClerc also
admitted that he had <u>actual</u> notice of Fun Depot's corporate
structure prior to October 3, 2000.  Specifically, LeClerc
admitted that he spoke to Petersen about Fun Depot in 1999 and
that during their conversation Petersen expressly told him that
Adib was the sole shareholder of Fun Depot.  In that regard, Mr.
LeClerc testified as follows:

> **Q:  Do you recall having a telephone conversation with Mr.
>      Petersen?**
> A:   I believe we spoke once on the telephone.
> **Q:  Was that the following year 1998?**
> A:   Yes, I believe that was the year.
> **Q:  And do you recall the subject matter of the
>      conversation you had with Mr. Petersen in 1998?**
> A:   It was in regards to the fluctuation of the rent that
>      was being paid --- from Fun Depot, Inc. to Carefree
>      Park Inc.
> **Q:  <u>And was any of that discussion – during that discussion</u>
>      <u>with Mr. Petersen in 1998 did you have any discussion</u>
>      <u>about the ownership interests of Fun Depot, who owned</u>
>      <u>it?</u>**
> A:   <u>Yes, we did</u>.
> **Q:  <u>And what did you learn from that conversation in 1998?</u>**
> A:   <u>That Fun Depot was, in fact, an S corporation and that</u>
>      <u>Adib Nabhan was the 100 percent shareholder.</u>
> **Q:  <u>And you learned that in a conversation with Mr.</u>
>      <u>Petersen in 1998, correct?</u>**

```
A:    Yes, I did.
Q:    And you learned that within the scope of your putting
      together financial statements for Carefree Park
      Corporation; is that correct?
A:    That's correct (emphasis added).
```

*See* LeClerc Tr. at 9:19-10:16.

Similarly, Petersen testified that he told LeClerc about Fun

Depot's corporate structure as early as 1997.[9]  In this regard,

Petersen testified as follows:

```
Q:    At the very bottom of your letter you offered that if
      Mr. LeClerc had any questions concerning this
      information, that he could call.
A:    That is correct, yes.
Q:    Did you, in fact, have a discussion with Mr. LeClerc on
      or about August 1997?  I just want a yes or no to that.
A:    Yes.
Q:    I'd like to direct you to page 5, Exhibit 52.

MR. CRAWFORD:  And, Mr. Lilly, if you could
highlight the paragraph that starts "there is no liability"
and blow that up, please.

Q:    Is this a statement that was contained within the Fun
      Depot, Inc. statement of revenues and expenses that you
      provided to Mr. LeClerc?
A:    Yes.  It's required to have that on there, yes.
Q:    And could you explain to the jury what in layman's terms
      this paragraph means?
A:    It means what I stated previously, that an S corporation
      will not pay a tax on its net profit, that it will flow
      through to the personal individual's income tax return
      so the financial statement does not reflect any federal
      income taxes on that money.  So there's no disclosure
      for those.
Q:    Is this a disclosure of Fun Depot, Inc. as a subchapter
      S corporation?
A:    It would be, yes.
Q:    And you furnished that to Mr. LeClerc in August of 1997?
A:    That's correct.
Q:    Did this note confirm any discussions that you had with
      Mr. LeClerc at the time?
A:    Yes.
Q:    Do you recall discussing the topic of Fun Depot, Inc.
      being an S corporation with Mr. LeClerc?
```

---

[9] Regardless of whether LeClerc received actual notice in 1997, 1998, or 1999,
Plaintiffs Complaint was untimely filed.  Plaintiffs' Complaint was filed on
October 3, 2003 and therefore notice anytime before October 3, 2000 means
that this lawsuit was not timely brought.

> <u>A:</u>  <u>Yes</u>.
> **Q:  Based on those conversations with Mr. LeClerc in 1997 what was your understanding of what he knew about the ownership structure of Fun Depot, Inc.?**

MR. KIRBY:  Objection.
THE COURT:  Sustain this objection.  Actually, I think since we are interested in the -- this is a question about notice.  I think I'll let you have the other question to which I ruled against you.
MR. CRAWFORD:  Thank you.
BY MR. CRAWFORD:

> **Q:**  <u>**Let me ask the question again.  What did you and Mr. LeClerc discuss in your conversation in 1997 about the paragraph that appears on page 5 of Exhibit 52**</u>**?**
> A:  <u>We did discuss the fact that Fun Depot, Inc. was an S corporation and that Eddie, or Adib, was a 100 stockholder</u>.

*See* Petersen Tr. at 14:23-16:24.

Because neither LeClerc nor Petersen's testimony was disputed at trial, there is no doubt that LeClerc received actual notice of Fun Depot's corporate structure prior to October 3, 2000.  Accordingly, Plaintiffs were put on actual notice of Adib's alleged seizure of a corporate opportunity more than three years before this lawsuit was filed.

In sum, when all of the evidence is viewed in a light most favorable to Adib, Plaintiffs have failed to demonstrate that the jury could not reasonably conclude that Plaintiffs' claims were barred by the statute of limitations.  The jury's verdict was correct, and it should not be disrupted.

## V.    CONCLUSION

For all of the foregoing reasons, the Plaintiffs' Motion and Memorandum in Support for a New Trial on the Issue of Whether

Plaintiffs' Claims are Barred by the Statute of Limitations should be denied.

ADIB NABHAN

By his attorneys,

/s/ Ian Crawford
Ian Crawford (BBO#544475)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626
icrawford@toddweld.com

Doyle C. Valley, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, MA  02210
(617) 737-8846
dvalley@morrisonmahoney.com

DATED:   April 13, 2006

CERTIFICATE OF SERVICE

I, Ian Crawford, hereby certify that this document has been filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date:  April 13, 2006                    /s/ Ian Crawford

                                         Ian Crawford